W. H. H. CHAMBERLIN, INC., Respondent and Appellant, *v.* ELMER F. ANDREWS, as Industrial Commissioner of the State of New York, et al., Appellants and Respondents.

E. C. STEARNS & Co., Respondent and Appellant, *v.* ELMER F. ANDREWS, as Industrial Commissioner of the State of New York, et al., Appellants and Respondents.

ASSOCIATED INDUSTRIES OF NEW YORK STATE, INC., Respondent, *v.* THE DEPARTMENT OF LABOR OF THE STATE OF NEW YORK et al., Appellants.

(Argued March 19, 1936; decided April 15, 1936.)

*John J. Bennett, Jr., Attorney-General* (*Henry Epstein* of counsel), for Elmer F. Andrews, as Industrial Commissioner of the State of New York, et al., defendants, appellants and respondents.

4

*John J. Bennett, Jr.,* Attorney-General (*Henry Epstein* and *John C. Crary* of counsel), for The Department of Labor of the State of New York et al., appellants.

*Henry S. Fraser* and *G. Everett De More* for W. H. H. Chamberlin, Inc., et al., plaintiffs, respondents and appelants.

*A. S. Andrews, amicus curiæ.*

6

*James McCormick Mitchell* for Associated Industries of New York State, Inc., respondent.

CRANE, Ch. J.   The complaint in each of the actions herein asks for a declaratory judgment that the New York unemployment insurance law (Laws of 1935, ch. 468; Labor Law, art. 18; Cons. Laws, ch. 31) is unconstitutional under both the Federal and the State Constitutions.

The plaintiffs moved for judgment on the pleadings under rule 112 of the Rules of Civil Practice, and the court in the first two cases granted the motions to the extent of holding that subdivision 2 of section 504 of the statute violates section 6 of article I of the New York Constitution, and section 1 of the Fourteenth Amendment to the Federal Constitution.   The court upheld the statute otherwise and granted judgment in favor of the defendants to that extent.

In a companion case, *Associated Industries of New York State, Inc.*, v. *Department of Labor et al.*, the Special Term, after issue joined, adjudged the said act to be unconstitutional and void in its entirety as depriving the plaintiff of its property without due process of law, and denying to it the equal protection of the law.   These cases come directly to this court, pursuant to subdivision 3 of section 588 of the Civil Practice Act, a constitutional question being solely presented for review.   We do not share the doubts expressed by these Special Terms.

The courts can take judicial notice of the fact that unemployment for the last five or six years has been a very acute problem for State and Federal government. There have always been from earliest times the poor and unfortunate whom the State has had to support by means of money raised by taxation.   We have had our homes for the poor and the infirm, hospitals, infirmaries and many and various means for taking care of those who could not take care of themselves.   The institutions housing our insane have grown to be an enormous expense, illustrating that the legality of the expenditure of public moneys for vast numbers of those who were without means of support or help has never been questioned.

Another problem has faced society which has been a source of study, discussion, agitation and planning. Unemployment, from whatever cause, has increased enormously in every part of the country, if not throughout the world. Is there any means possible to provide against unemployment, the loss of work, with its serious consequences to the family, to the children and to the public at large? When such a matter becomes general and affects the whole body politic, a situation has arisen which requires the exercise of the reserve power of the State, if there be a practical solution. Some have suggested that for the periodical recurrence of panics and hard times, 'the actuary might be able to work out a scheme of insurance. We need not pause to determine whether this can be done or not. The fact is that in the past few years enormous sums of State and Federal money have been spent to keep housed and alive the families of those out of work who could not get employment. Such help was absolutely necessary, and it would be a strange kind of government, in fact no government at all, which could not give help in such trouble.

The Legislature of the State, acting after investigation and study and upon the report of experts, has proposed what seems to it a better plan. Instead of solely taxing all the people directly it has passed a law whereby employers are taxed for the help of the unemployed, the sums thus paid being cast upon the public generally through the natural increase in the prices of commodities. Whether relief be under this new law of the Legislature or under the dole system the public at large pays the bill.

We may concede that much of unemployment is due to other factors than business depression. Just what does cause slumps in business, panics and unemployment has never been satisfactorily explained, but a very large percentage of those who are out of work have lost their jobs or positions by reason of poor business conditions and hard times. I can see, therefore, nothing unreasonable or unconstitutional in the legislative act which seeks

to meet the evils and dangers of unemployment in the future by raising a fund through taxation of employers generally.

This act in brief taxes a certain class of employers three per cent on their payrolls. This class of employer includes those who have employed at least four persons within each of thirteen or more calendar weeks in the year 1935, or any subsequent calendar year. The employment of farm labor, of one's spouse or minor child, or employment in certain charities are excluded.

Unequal protection of the laws and unfair classification are charged against this act because employers who have had no unemployment are obliged to contribute to a fund to help those who have lost positions in failing or bankrupt businesses; also because the line is drawn at four employees instead of including all and any employer. We do not think that this narrow view is required by any constitutional provision. People have to live and when they cannot support themselves someone has to look after them. When able-bodied, willing men cannot find work they may be treated as a class, irrespective of their particular calling or trade. The peril to the State arises from unemployment generally not from any particular class of workers. So likewise, employers generally are not so unrelated to the unemployment problem as to make a moderate tax upon their payrolls unreasonable or arbitrary. As stated before, unemployment and business conditions generally are to a large extent linked together. Reasonable classification has been explained in *Truax* v. *Corrigan* (257 U. S. 312, p. 337). Quoting from *Southern Ry. Co.* v. *Greene* (216 U. S. 400, 417), the court said: " While reasonable classification is permitted, without doing violence to the equal protection of the laws, such classification must be based upon some real and substantial distinction, bearing a reasonable and just relation to the things in respect to which such classification is imposed; and classification cannot be arbitrarily made without any substantial basis."

That the purpose of this law is to help those who have worked when they could get work — the working class at present out of work — is apparent from the limitation to the benefits. Section 503 of the act reads as follows:

" Liability for payment of benefits. 1. Benefits shall be paid from the fund to each unemployed employee entitled thereto.

" 2. Benefits shall become payable two years from the date on which contributions by employers become payable under this article.

" 3. No employee shall be entitled to any benefits unless he

" (a) is suffering total unemployment as defined in this article; and

" (b) has, as provided in this article, registered as totally unemployed and reported for work or otherwise given notice of the continuance of his unemployment; and

" (c) has had not less than ninety days of employment as defined in this article within the twelve months preceding the day on which benefits are to commence, or (in the alternative) unless he has had not less than one hundred and thirty days of employment during the twenty-four months preceding the day on which benefits are to commence; and

" (d) in no case shall the fund be liable to pay benefits to an employee for any unemployment occurring more than twelve months after the date on which such employee was in employment, and in no case in which the claim for benefit has not been filed in the local state employment office as provided in section five hundred and ten, subdivision three, within two years of the last day of employment preceding the period for which such claim is made.

" (e) The fund shall pay benefits to employees in the ratio of one week of benefit for each fifteen days of employment within the fifty-two weeks preceding the beginning of the payment of benefits."

Further limitations are found in the sections following:

"§ 504. Waiting period. 1. An employee shall be entitled to benefits on account of unemployment which continues subsequent to a waiting period of three weeks after notification of unemployment: Provided that not more than five weeks of unemployment for which no benefit is paid shall be required as a waiting period within any calendar year (except as otherwise provided under subdivision two of this section). No week of unemployment shall count as a waiting period in any case except weeks of unemployment as to which notification of unemployment has been given.

"2. An employee shall not be entitled to benefits except for unemployment which continues subsequent to a waiting period of ten weeks:

"(a) if he has lost his employment through misconduct in connection with his employment; or

"(b) if he has lost his employment because of a strike, lockout or other industrial controversy in the establishment in which he was employed.

"§ 505. Amount of benefits. 1. Benefits shall be payable on account of total unemployment after the specified waiting period at the rate of fifty per centum of the employee's full-time weekly wages, but not to exceed a maximum of fifteen dollars per week, nor to be less than a minimum of five dollars per week. * * *

"§ 506. Disqualification for benefits. 1. No benefits shall be payable to any employee who refuses to accept an offer of employment for which he is reasonably fitted by training and experience, including employments not subject to this article; provided, however, that no employee otherwise qualified to receive benefits shall lose the right to benefits by reason of a refusal to accept employment if

"(a) acceptance of such employment would either require the employee to join a company union or would interfere with his joining or retaining membership in any labor organization; or

" (b) there is a strike, lockout or other industrial controversy in the establishment in which the employment is offered; or

" (c) the employment is either not within the state or at an unreasonable distance from his residence, or travel to and from the place of employment involves expense substantially greater than that required in his former employment unless the expense be provided for; or

" (d) the wages, hours and conditions offered are substantially less favorable to the employee than those prevailing for similar work in the locality, or are such as tend to depress wages or working conditions.

" § 507. Limitation of amount of benefits. The total amount of benefits to which an employee shall be entitled in any consecutive fifty-two weeks shall not exceed sixteen times his benefit for one week of total unemployment."

Seasonal occupations are to be provided for by rules and regulations after further investigation.

What shall we say about this act? At least it is an attempt to solve a great and pressing problem in government. We have had such problems thrust upon our attention arising out of emergencies such as the rent laws (*People ex rel. Durham. Realty Corp.* v. *La Fetra*, 230 N. Y. 429), the housing laws (*Adler* v. *Deegan*, 251 N. Y. 467), and the milk laws (*People* v. *Nebbia*, 262 N. Y. 259). The Legislature seeks to meet the future now without waiting for the emergency to arise. Can it do so? Unless there is something radically wrong, striking at the very fundamentals of constitutional government, courts should not interfere with these attempts in the exercise of the reserve power of the State to meet dangers which threaten the entire common weal and affect every home. No large body of men and women can be without work and the body politic be healthy.

The fund, known as the Unemployment Insurance Fund, created under this law, is to be deposited in or

invested in the obligations of the unemployment trust fund of the United States government. This is merely a form of security, the moneys never leaving the power or control of the State authorities. Whether we consider such legislation as we have here a tax measure or an exercise of the police power seems to me to be immaterial. Power in the State must exist to meet such situations, and it can only be met by raising funds to tide over the unemployment period. Money must be obtained and it does not seem at all arbitrary to confine the tax to a business and employment out of which the difficulty principally arises.

It is said that this is taxation for the benefit of a special class, not the public at large, and thus the purpose is essentially private. The Legislature, after investigation, has found the facts to be that those who are to receive benefits under the act are the ones most likely to be out of employment in times of depression. The courts cannot investigate these facts and should not attempt to do so. The briefs submitted show that the classification or selection made by the Legislature has followed investigation and has sought to reach the weakest spot. Experience may show this to be a mistake. No law can act with certainty; it measures reasonable probabilities. " Judicial inquiry does not concern itself with the accuracy of the legislative finding, but only with the question whether it so lacks any reasonable basis as to be arbitrary. (*Standard Oil Co.* v. *Marysville,* 279 U. S. 582, 586, 587.)" (Mr. Justice ROBERTS in *Borden's Farm Products Co.* v. *Ten Eyck,* 297 U. S. 251, 263.)

Fault is also found, perhaps with some justification, with the benefit allowed, after a period of ten weeks' idleness, to those who have been discharged or left because of strikes. Here again the Legislature must exercise its judgment, and a full scheme or plan cannot be condemned because the courts may not approve of certain details.

So too, the right to refuse other work of a certain kind when offered has come in for criticism. There may be a diversity of views as to the wisdom of these provisions, but again, these are not matters for the courts to consider unless they become so extreme as to become arbitrary.

Whether or not the Legislature should pass such a law or whether it will afford the remedy or the relief predicted for it, is a matter for fair argument but not for argument in a court of law. Here we are dealing simply with the power of the Legislature to meet a growing danger and peril to a large number of our fellow citizens, and we can find nothing in the act itself which is so arbitrary or unreasonable as to show that it deprives any employer of his property without due process of law or denies to him the equal protection of the laws.

I am of the opinion that the decision in *Railroad Retirement Board* v. *Alton R.R. Co.* (295 U.S. 330) is not applicable here. The Railroad Retirement Act of June 27, 1934, held to be unconstitutional, related to the pensioning of a certain class of employees. It could not be sustained as a police regulation or within the police power as no such power exists in the Federal government and the act failed to come within the field of interstate commerce as stated in the opinion. Even the police power of the State might fall far short of enabling the Legislatures of the States to provide for pensioning employees in favored industries or employment.

In the first two above-entitled actions, the judgments in so far as appealed from by the plaintiffs should be affirmed, without costs; and the judgments in so far as appealed from by the defendants should be reversed, without costs, and plaintiffs' motions for judgment on the pleadings denied, without costs, and final judgment ordered herein in favor of defendants and against the plaintiffs dismissing the complaints herein upon the merits, without costs, and adjudging and declaring that as to the plaintiffs chapter 468 of the Laws of 1935 of the

State of New York does not in any respect violate section 6 of article I of the Constitution of the State of New York and does not in any respect violate section 1 of the Fourteenth Amendment to the Constitution of the United States and does not violate any other provision of the Constitution of the State of New York and does not violate any other provision of the Constitution of the United States.

A question under the Federal Constitution was presented and necessarily passed upon by this court. The plaintiffs contended that chapter 468 of the Laws of 1935 of the State of New York is repugnant to section 1 of the Fourteenth Amendment to the Constitution of the United States. This court held the aforesaid law of the State of New York is not repugnant to section 1 of said Fourteenth Amendment to the Constitution of the United States.

In the third above-entitled action, the judgment should be reversed and the complaint dismissed, without costs, and motion for judgment on the pleadings denied, without costs.

A question under the Federal Constitution was presented and necessarily passed upon by this court. It was contended by the plaintiff that chapter 468 of the Laws cf 1935 of the State of New York is repugnant to section 1 of the Fourteenth Amendment to the Constitution of the United States. This court held the aforesaid law of the State of New York is not repugnant to section 1 of the Fourteenth Amendment to the Constitution of the United States.

HUBBS, J. (dissenting). It is asserted by the defendants that unemployment is a matter of public concern and that a system of insurance to relieve its burdens tends to promote the public welfare and that it is within the reserved police power of the State to enact statutes to accomplish that end. Based on that premise the defendants contend that the New York Unemployment Insurance Law

(Laws of 1935, ch. 468) is constitutional in all its parts. The statute covers employers and employees in every kind of industry excepting six classes: (a) Agricultural employments; (b) family relationship; (c) religious, charitable and educational work; (d) non-manual or " white collar " occupations where the salary or wage is over fifty dollars per week; (e) employment by the State or governmental subdivisions; (f) employers employing less than four persons. The statute excludes from its operation all unemployed employees belonging to a class, other than manual laborers, employed at a rate of wages of more than twenty-five hundred dollars a year or more than fifty dollars a week.

All employers must pay annually three per cent of the total annual payroll of those entitled to benefits to a State fund called the unemployment insurance fund, the payment for 1936 to be one per cent; for 1937, two per cent, and thereafter three per cent annually, the entire fund to consist of such payments.

Benefits from the fund thus established can only be paid to one who has first established total loss of employment as defined in the statute and who has been employed for a specified period in the year or two years just preceding his unemployment. The amount of benefits from the fund and their duration are limited to fifty per cent of the prior wage but not less than five dollars a week nor more than fifteen dollars per week and for not longer than sixteen weeks. A waiting period of three weeks must intervene between the filing of a notice of unemployment and the commencement of benefits.

In cases of discharge for misconduct or on account of strikes or industrial disputes the waiting period is ten weeks. An unemployed person who refuses employment loses his right to benefits provided the offered employment is not objectionable on the specific grounds specified in the statute. Contributions from all employers covered

by the statute are pooled by deposit in one fund. Administration is by the Industrial Commissioner with an advisory council. The Commissioner is to set up local offices throughout the State to act as agencies for employment and for the distribution of benefits. Such in a general way is the plan which it is contended by the defendants will promote public welfare and prosperity.

It is well to have in mind some of the things which the statute was not enacted to accomplish. The statute is not limited in its application to involuntary unemployment. One who voluntarily leaves employment or is discharged for valid cause may still be entitled to benefits.

The statute deals entirely with the effect of unemployment. It contains no provisions to prevent or limit its spread. It provides benefits for a defined class of unemployed employees. It does not deal with the causes of unemployment or cause more employment except it creates more offices which must be filled.

Neither the State nor employees contribute to the fund. A merit rating system under which an employer contributes to the fund with reference to unemployment in his business is not provided for as in all other statutes on the subject enacted by other States. One in whose business there is no unemployment pays into the fund on the same basis as one in whose business there exists an unusually large proportion of unemployment.

Benefits are not based upon need of financial assistance. One with an assured income is entitled to the same benefits as one without any income at all. The statute also permits the payment of benefits to one who quits a job without excuse or justification; to one discharged for misconduct; to one who went out on a strike; to one wrongfully discharged who may have a valid cause of action to recover damages for such wrongful discharge; to one to whom employment is available if such employment falls within the exceptions specified in the statute. The statute also requires payments into the fund by the

employer of four or more persons in cases where the employers have no business whatever as in the case of domestic servants.

Broadly, the defendants contend that the statute will have the effect of alleviating the evils of unemployment, promote industrial security and the general welfare. To sustain such contention the defendants have submitted to the court charts, documents and extra judicial opinions tending to sustain such contention. The plaintiffs have also submitted literature of like nature, tending to establish exactly the opposite contention. Interesting as such literature is, I suppose it is only competent as tending to establish the fact that reasonable persons may entertain different views and that, therefore, the question was one for the determination of the Legislature and not for the courts. See opinion of Justice HOLMES in *Adkins* v. *Children's Hospital*, 261 U. S. 525, 570, 571, also opinion of Justice SUTHERLAND at pp. 559, 560.

There can be no doubt about the general principles which govern courts in passing upon the constitutionality of statutes which depend upon the existence of facts which have been investigated by the Legislature. There always exists a presumption in favor of the findings of the Legislature and the validity of its acts. Courts must, however, be able to discern that there is a reasonable basis for the Legislature's findings and that its action has a real and substantial relation to the public welfare. (*Jacobson* v. *Massachusetts*, 197 U. S. 11; *O'Gorman and Young, Inc.*, v. *Hartford Fire Ins. Co.*, 282 U. S. 251.)

While the plaintiffs question the constitutionality of various separate provisions of the statute, their principal contention strikes at the very heart of the act and asserts that the act is unconstitutional as a whole because it constitutes a violation of section 1 of the Fourteenth Amendment of the Constitution of the United States which provides that no State shall " deprive any person of life, liberty, or property, without due process of law " nor

deny to any person the equal protection of the laws. Also that it violates section 6 of article 1 of the State Constitution which provides that no ·person shall "be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation."

The court below (Special Term, Albany county) in the action brought by the Associated Industries of New York State, Inc., sustained the plaintiff's contention upon those broad grounds; in the actions brought by W. H. H. Chamberlin, Inc., and E. C. Stearns & Co. the court below (Special Term, Onondaga county) sustained the plaintiffs' contention to the extent of invalidating the statute in so far as benefits are made payable thereby to employees discharged for misconduct or unemployed due to a strike, lock-out or other industrial controversy, but upheld the statute otherwise. The questions presented are whether the statute deprives plaintiffs of their property without due process of law, whether it denies to plaintiffs the equal protection of the laws, whether it deprives plaintiffs of their liberty of contract without due process of law and whether it takes plaintiffs' property for public use without just compensation.

If the statute violates the constitutional provisions in either respect, it cannot be sustained no matter how persuasive the arguments may be that it promotes the public welfare, and is, therefore, within the police power. " First the constitution and then the police power " is the test that courts are required to apply.

If the United States Supreme Court has in principle decided the questions involved we should follow such decision without regard to our personal views. (*People ex rel. Tipaldo* v. *Morehead*, 270 N. Y. 233.)

The statute contains a declaration of the policy of the State which is declared to be that " economic insecurity due to unemployment is a serious menace to the health, welfare and morals of the people of this state;"

also " involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family" (§ 500).

The statute, however, is not limited in its application to involuntary unemployment and it does not contain any provision which tends to prevent its spread. It is limited to the effects of unemployment and provides benefits for a limited class of unemployed employees.

It does not by its provisions tend to prevent unemployment or to bring about greater employment. In fact, it is urged by plaintiffs that the effect of the statute will necessarily be to increase unemployment because those employing four persons will get along with the assistance of three so as to avoid the necessity of contributing to the fund and that all employers subject to the statute will reduce the number of employees and the amount of the payroll as much as possible and thereby keep the amount of contributions to the fund as low as possible.

The statute recites that " the well-being of the wage earners of this state require(s) the enactment of this measure for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own" (§ 500). Nevertheless, the statute provides for benefits to those who may be unemployed through their own fault.

Concededly, the act does not purport to have been enacted for the benefit of the wage earners of the State as a whole but its benefits are limited to a certain class of unemployed wage earners. Those not included in the act under the operation of well-settled economic laws will be injuriously affected as employers will, as far as possible, add the three per cent of the wage roll which they are compelled to pay into the fund to the selling

price of goods or services and a portion of the increased cost will be borne by the wage earners not covered by the act.

The three per cent of the payroll which every employer is required to pay into the fund is not paid for the benefit of his own unemployed employees only. He may not have any unemployed employees and his entire contributions to the fund may be used for the unemployed employees of others even though such unemployed employees are not in need of financial assistance. It is, therefore, urged that general welfare cannot be promoted by the act; that only the limited class entitled to share in the fund are benefited, but that even though there is some benefit to the general public, it is indirect. Finally, it is urged that there is no way that unemployment may be lessened or benefited by placing increased burdens on employers. It is pointed out that under the act the employer who employs the most help and pays the highest wages and contributes most to the welfare of wage earners is penalized by being required to pay most into the fund.

It seems clear that the statute cannot be sustained as a tax law. The statute does not levy or assess a tax. It is a part of the Labor Law and it prescribes penalties contrary to the provisions of the Tax Law (Cons. Laws, ch. 60) making it a misdemeaner for an employer willfully to refuse to pay three per cent of his payroll into the fund. "A tax, in the general understanding of the term, and as used in the Constitution, signifies an exaction for the purpose of the Government. The word has never been thought to connote the expropriation of money from one group for the benefit of another." (*United States* v. *Butler*, 297 U. S. 1.)

If the statute is to be sustained, it must be because it is deemed to be within the police power of the State. That power, however, is limited by the Constitution and it has always been held that the Legislature could

not, under the guise of the police power, enact a valid law the effect of which would be to take the property of one class and give it to another class. (*Louisville Joint Stock Land Bank* v. *Radford,* 295 U. S. 555, 601; *Lake Shore & Michigan Southern Ry. Co.* v. *Smith,* 173 U. S. 684; *Railroad Retirement Board* v. *Alton R. R. Co.,* 295 U. S. 330.)

The statute clearly indicates that the purpose of the Legislature was not the relief of the poor and needy but the benefit of a limited class of employees temporarily out of work.

The benefit to the general public, if any, would be indirect and incidental. Such benefit does not make the statute one for the general welfare.

I am unable to distinguish this case from the principle decided in the case of *Railroad Retirement Board* v. *Alton R. R. Co.* (*supra*) which decided that the act of Congress was in conflict with the due process clause of the Fifth Amendment which is the same as the due process clause of the Fourteenth Amendment applicable to State legislation. (*Nebbia* v. *New York,* 291 U. S. 502, 525.)

The decision in that case was placed upon two grounds: *First,* as above stated, and, *second,* upon the ground that the statute did not constitute a regulation of interstate commerce. The decision on the first ground is as binding upon this court as the decision upon the second ground. I agree with Justice RUSSELL, who presided at Special Term in the action brought by Associated Industries of New York State, Inc., that the principle decided is applicable and controlling in this case. The provisions of the Federal act and the statute here involved are very similar. The Federal act provides for compulsory contributions by railroads to a fund to be distributed as pensions to retired employees, the fund to be a single pooled fund, the fund to be made up of contributions of employers and employees. All interstate carriers are treated as a single employer and all employees as employ-

ees of a single employer; the benefits under the fund to be at a given rate; the contributions of individual carriers to the fund to be at a disparate rate. The Federal act applies only to interstate carriers subject to Federal regulation. It requires each carrier to contribute a fixed amount annually without regard to the number of employees who become superannuated and, therefore, entitled to the benefits of the fund. It provides that former employees no longer in the service who may have been discharged for cause shall be entitled to the benefits. It also provides that an employee shall be entitled to benefits without regard to his need for financial assistance. It will be observed that those provisions are in substance contained in the statute here in question. Mr. Justice ROBERTS, writing the opinion for a majority of the court, said: " It is arbitrary in the last degree to place upon the carriers the burden of gratuities to thousands who have been unfaithful and for that cause have been separated from the service, or who have elected to pursue some other calling, or who have retired from the business, or have been for other reasons lawfully dismissed. * * * Certain general features of the system violate the fifth amendment. . Under the statutory plan the draft upon the pension fund will be at a given rate, while the contributions of individual carriers to build up the fund will be at a disparate rate. This results from the underlying theory of the act, which is that all the railroads shall be treated as a single employer. * * * There is no warrant for taking the property or money of one and transferring it to another without compensation, whether the object of the transfer be to build up the equipment of the transferee or to pension its employees. * * * We conclude that the provisions of the act which disregard the private and separate ownership of the several respondents, treat them all as a single employer, and pool all their assets regardless of their individual obligations and the varying condi-

tions found in their respective enterprises, cannot be justified as consistent with due process." (*Railroad Retirement Board* v. *Alton R. R. Co.*, *supra*, pp. 349, 355, 357, 360.)

The opinion also points out that the act is intended to furnish assurance of payments of pensions to employees of all the carriers so that solvent railroads are required to furnish the money necessary to meet the demands of the system upon insolvent carriers. The effect of the decision is to hold that the act is invalid because in conflict with the due process clause of the Fifth Amendment.

The defendants rely largely on the cases involving workmen's compensation statutes to sustain the validity of the present act. I think those cases have no application. They are distinguished in the opinion of Justice ROBERTS, who also distinguishes the case of *Dayton-Goose Creek Ry. Co.* v. *United States* (263 U. S. 456) and *Noble State Bank* v. *Haskell* (219 U. S. 104).

The head money case (*Edye* v. *Robertson*, 112 U. S. 580) involved the regulation of foreign commerce involved in immigration, a subject of regulation by the Federal government. The sheep-dog cases are based upon the nature of the animals which makes it legal to regulate and limit their keeping and to encourage the raising of sheep. (*Longyear* v. *Buck*, 83 Mich. 236; *Nicchia* v. *People*, 254 U. S. 228, 230, 231.)

The case of *Cooley* v. *Board of Wardens* (12 How. [U. S.] 299) was decided upon the principle that the purpose of the statute was the regulation of navigation in the interest of public safety. The principles involved in those cases are not applicable in this case.

The tax or contribution is not against industry or employers. It is against a certain class of individuals and corporations who are engaged in employing wage earners. The term " industry " is a mere concept. The burden is placed not upon industry but on those of a certain class who are engaged in industry and upon

others not so engaged. It is placed not alone upon those who have unemployed wage earners but also upon those who have no unemployed workers. No one questions the obligation and duty of the State. That question is not involved. The question here involved is whether the State may place that burden upon a certain class of individuals and corporations for the benefit of another class for whose condition they are in no way responsible.

If the statute is unconstitutional in its main features, no part of the act can be sustained. We cannot rewrite the statute.

So much of the judgments as were appealed from by W. H. H. Chamberlin, Inc., and E. C. Stearns & Co. should be reversed, without costs, and so much of the said judgments as were appealed from by the defendants therein should be affirmed, without costs, and the plaintiff's motions for judgment on the pleadings granted, without costs. The judgment in the action brought by Associated Industries of New York State, Inc., should be affirmed, without costs and its motion for judgment on the pleadings granted, without costs.

LEHMAN, CROUCH, LOUGHRAN and FINCH, JJ., concur with CRANE, Ch. J.; HUBBS, J., dissents in opinion in which O'BRIEN, J., concurs.

Judgment accordingly.