**NEW YORK TELEPHONE COMPANY, Western Electric Company, American Telephone & Telegraph Company, Long Lines Department, and Empire City Subway Company (Limited), Plaintiffs-Appellees,**

v.

**NEW YORK STATE DEPARTMENT OF LABOR, Louis L. Levine, Industrial Commissioner of the New York State Department of Labor, New York State Department of Taxation & Finance, and James H. Tully, Jr., State Commissioner of Taxation & Finance, Defendants-Appellants.**

No. 1553, Docket 77–7337.

United States Court of Appeals, Second Circuit.

Argued July 22, 1977.

Decided Nov. 9, 1977.

Maria L. Marcus, Asst. Atty. Gen. of the State of New York, New York City (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen. of the State of New York, Nicholas G. Garaufis, Asst. Atty. Gen. of the State of New York, New York City, of counsel), for defendants-appellants.

David L. Benetar, New York City (George E. Ashley, William P. Witman, Stanley Schair, Mark H. Leeds, Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, of counsel), for plaintiffs-appellees.

Doran, Colleran, O'Hara, Pollio & Dunne, Garden City, N. Y. (Richard L. O'Hara, Robert A. Kennedy, Garden City, N. Y., of counsel), for amicus curiae New York State AFL–CIO.

Richard H. Markowitz, Robert C. Cohen, Markowitz & Glanstein, New York City, for Local 1, International Union of Elevator Constructors, AFL–CIO, as amicus curiae.

Lawrence M. Cohen, Jeffrey S. Goldman, Lederer, Fox & Grove, Chicago, Ill., Thomas W. Misner, Dow Chemical Company, Midland, Mich., for amicus curiae Dow Chemical Co.

Frank J. Donner, Robert Z. Lewis, James G. Mauro, Jr., New York City, Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, Eisner, Levy, Steel & Bellman, New York City, Winn Newman, Washington, D. C., Cammer & Shapiro, New York City, Vladeck, Elias, Vladeck & Lewis, New York City, for amici curiae: District 65, Distributive Workers of America; International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC; United Electrical, Radio and Machine Workers of America (UE); District 1199, National Union of Hospital & Health Care Employees, Retail, Wholesale and Department Store Union, AFL–CIO; District 3, International Union of Electrical, Radio and Machine Workers of America; District Council 1707, Community and Social Agency Employees Union, American Federation of State and Municipal Employees, AFL–CIO; Furriers Joint Council of New York, AFL–CIO; Joint Board, Fur, Leather and Machine Workers Union, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO; Butcher District Council of New York, Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO; International Brotherhood of Teamsters & Warehousemen, Brewery Delivery Employees Local # 46; Local 101, Utility Division, Transportation Workers Union of America, AFL–CIO; Local 140, Bedding, Curtain and Drapery Workers Union, United Furniture Workers of America, AFL–CIO; Local 259, International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; Shopmen's Local 455, International Association of Bridge, Structural and Ornamental Iron Workers, AFL–CIO; Professional and Administrative Staff Association, Museum of Modern Art; United Store Workers Union, Retail, Wholesale and Department Store

Union, AFL–CIO; Association of Legal Aid Attorneys, New York, New York; Legal Services Staff Association, New York, New York; Metropolitan Opera Orchestra Committee, New York, New York; United Optical Workers Union, Local 408, International Union of Electrical, Radio and Machine Workers of America, AFL–CIO; Architectural and Engineering Guild Local 66, American Federation of Technical Employees, AFL–CIO.

Nixon, Hargrave, Devans & Doyle, Rochester, N. Y. (Eugene D. Ulterino, Gail A. Kreusch, Rochester, N. Y., of counsel), for amici curiae in support of affirmance.

Before MESKILL, Circuit Judge, BRYAN * and STEWART,** District Judges.

MESKILL, Circuit Judge:

New York's Unemployment Insurance Law permits employees who are involved in a "strike, lockout, or other industrial controversy" to collect unemployment compensation after a waiting period of eight weeks. N.Y.Lab.Law §§ 590.9, 592.1 (McKinney 1977). The district court held this statute invalid under the supremacy clause, U.S.Const. art. VI, cl. 2, finding that it alters the balance in the collective bargaining relationship and therefore conflicts with the federal labor policy favoring the free play of economic forces in the collective bargaining process. 434 F.Supp. 810 (S.D.N.Y.1977). We reverse.

Approximately seventy percent of the Bell System's [1] non-management employees are represented by the Communications Workers of America, AFL–CIO ("CWA"). Prior to 1971, the long-standing collective bargaining format between members of the Bell System and the CWA was one of pattern-settlement. Under this format, the parties would select two Bell System companies with early contract expiration dates as pattern-setters. When an agreement was reached with the pattern-setters, it became the standard for settlement on national issues in the rest of the Bell System.

On April 30, 1971, the contracts of the chosen pattern-setters were due to expire. No agreement was reached, however, and those contracts, along with all other Bell System contracts that were due to expire, were mutually extended on a day-to-day basis. In June, the CWA International recommended a nationwide strike, which began on July 14. On July 18, an agreement in principle subject to ratification by mail, was reached, and the CWA ordered all employees back to work on July 21. Despite the International's directive, roughly 38,000 CWA members employed by the New York Telephone Company ("Telco") remained on strike in New York. Western Electric Company ("Weco") employees and American Telephone & Telegraph Company, Long Lines Department ("Long Lines") employees also stayed off the job.

On August 14, 1971, the employees of all Bell System companies except Telco and Empire City Subway Company (Limited) ("Empire") ratified the contract. The strike continued in New York for seven months, until February, 1972. Weco and Long Lines employees respected the picket lines of the striking Telco and Empire employees. During the strike, $43,000,000 in unemployment insurance benefits was paid, at an average rate of $75 per week, to 29,000 Telco employees and charged to Telco's account; $5,000,000 in benefits was paid to 4,150 Weco employees; $500,000 in benefits was paid to 350 Long Lines employees; and $100,000 in benefits was paid

---

* Hon. Frederick van Pelt Bryan, of the Southern District of New York, sitting by designation.

** Hon. Charles E. Stewart, Jr., of the Southern District of New York, sitting by designation.

1. The parties have stipulated that the term "Bell System", for the purposes of this lawsuit, includes American Telephone and Telegraph Company ("AT&T"), the twenty-one principal telephone operating companies owned, in whole or in major part, by AT&T and such other companies as Western Electric Company ("Weco") and Bell Telephone Laboratories, Inc. ("Bell Labs"), as well as all of the plaintiffs-appellees, New York Telephone Company ("Telco"), Weco, AT&T, Long Lines Department ("Long Lines") and Empire City Subway Company (Limited) ("Empire").

to 125 Empire employees. Had the strike not been settled, these payments would have continued until July of 1972. New York's unemployment insurance system is financed entirely by employer contributions, so the cost of making these payments was borne by the struck employers.

In a preemption case such as this one, "the crucial inquiry [is] whether Congress intended [this field to] be unregulated because [it was] left 'to be controlled by the free play of economic forces.'" *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 140, 96 S.Ct. 2548, 2553, 49 L.Ed.2d 396 (1976), *quoting NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144, 92 S.Ct. 373, 30 L.Ed.2d 328 (1971). Accordingly, we must examine congressional intent.[2] Those courts that have considered Congress' intent with respect to the payment of unemployment benefits to strikers have found it "ambiguous." *Grinnell Corp. v. Hackett*, 475 F.2d 449, 454–57 (1st Cir.), *cert. denied*, 414 U.S. 858, 94 S.Ct. 164, 38 L.Ed.2d 108 (1973); *Hawaiian Telephone Co. v. Hawaii Department of Labor & Industrial Relations*, 405 F.Supp. 275, 286 (D.Hawaii 1976). We do not agree. Here, as in most preemption cases, a positive expression of congressional intent is lacking, and the Court must resort to the drawing of inferences. In the instant case, the evidence upon which those

inferences must be based is not "ambiguous" but is relatively one-sided.

The question whether striking workers should be entitled to benefit from various forms of social welfare legislation has been a significant political issue since the early 1930s. In *Grinnell*, the First Circuit considered congressional awareness of the issue prior to the enactment of the National Labor Relations Act and the Social Security Act:

> In July 1933, the Federal Emergency Relief Administration (FERA) ruled that it would not "attempt to judge the merits of labor disputes" but would treat unemployed strikers like all other unemployed persons for purposes of relief. Brown, Public Relief 1929–39, 270 (1940). This policy became a bone of contention during the textile strike of September 1934. Bernstein, The Turbulent Years: A History of the American Worker 1933–41 (1971). Congress could hardly have been unaware of this policy when in 1935 it passed in close succession both the National Labor Relations Act . . . and the Social Security Act . . . .

475 F.2d at 454. The National Labor Relations Act, Pub.L.No. 74–198, 49 Stat. 449 (July 5, 1935), *as amended*, 29 U.S.C. § 151 *et seq.* ("NLRA"), makes no mention of unemployment compensation. On the other

---

**2.** In *Kimbell, Inc. v. Employment Security Commission of New Mexico*, 429 U.S. 804, 97 S.Ct. 36, 50 L.Ed.2d 64 (1976), the Supreme Court dismissed, for want of a substantial federal question, an appeal which raised, *inter alia*, the question at issue here. *Kimbell, Inc. v. Employment Security Commission of New Mexico*, No. 10323 (N.M.Sup.Ct.1975), *rev'g, Albuquerque-Phoenix Express, Inc. v. Employment Security Commission of New Mexico*, 88 N.M. 596, 544 P.2d 1161 (1975). We must therefore decide whether under the doctrine of *Hicks v. Miranda*, 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), the *Kimbell* dismissal is controlling. *See generally* Comment, The Precedential Weight of a Dismissal by the Supreme Court for Want of a Substantial Federal Question: Some Implications of *Hicks v. Miranda*, 76 Colum.L.Rev. 508 (1976). We agree with the district court that it is not. *See also Dow Chem. Co. v. Taylor*, 428 F.Supp. 86 (E.D.Mich. 1977). The district court's view has been confirmed by subsequent indications from the Su-

preme Court itself. *Ohio Bureau of Employment Servs. v. Hodory*, 431 U.S. 471, 475, n. 3, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *Batterton v. Francis*, 432 U.S. 416, 424, n. 7, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977). We are aware of the contrary decision of the Third Circuit in *Super Tire Eng'ring Co. v. McCorkle*, 550 F.2d 903 (3d Cir.), *cert. filed*, —— U.S. ——, 98 S.Ct. 106, 54 L.Ed.2d 86 (1977), and we respectfully disagree with that Court. We note that *Super Tire* was decided prior to *Hodory* and *Batterton*.

In *Kimbell* the Solicitor General and the NLRB argued to the Supreme Court that "it is apparent that Congress over the years has been aware of the disparate attitudes in the states as to the advisability of allowing strikers access to unemployment benefits and has decided to permit the diversity to continue." Brief for the United States as Amicus Curiae at 8, *Kimbell, Inc. v. Employment Security Commission of New Mexico*, 429 U.S. 804, 97 S.Ct. 36, 50 L.Ed.2d 64 (1976).

hand, Title IX of the Social Security Act, Pub.L.No. 74–271, §§ 901–910, 49 Stat. 639–45 (Aug. 14, 1935), which is now the Federal Unemployment Tax Act, 26 U.S.C. §§ 3301–09, was part of a legislative program "to stimulate the creation of and payment to State unemployment compensation funds." *United States v. Spencer*, 65 F.Supp. 763, 764 (D.Mass.1946) (Wyzanski, J.), *aff'd in part, rev'd in part sub nom. Massachusetts v. United States*, 160 F.2d 614 (1st Cir. 1947), *aff'd*, 333 U.S. 611, 68 S.Ct. 747, 92 L.Ed. 968 (1948). It was designed to deal with the urgent national problem of unemployment. *See Steward Machine Co. v. Davis*, 301 U.S. 548, 586–88, 57 S.Ct. 883, 81 L.Ed. 1279 (1937). This was done by imposing a federal excise tax on employers, while giving a tax credit to those who made contributions to qualified State plans. In order for a State plan to qualify, the State's law had to meet certain requirements, including three designed "to insure the compatibility of state unemployment compensation laws with the then brand-new labor statute." *Grinnell, supra*, 475 F.2d at 454–55. Under the statute, a State law could not deny benefits to individuals who refused to accept new work for any of the following reasons:

(A) If the position offered is vacant due directly to a strike, lockout, or other labor dispute;

(B) if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality;

(C) if as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona fide labor organization . . . .

Social Security Act § 903(a)(5), 49 Stat. 640, 26 U.S.C. § 3304(a)(5). The significance of this provision was considered in *Ohio Bureau of Employment Services v. Hodory*, 431 U.S. 471, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977). In that case, the Supreme Court

faced the question whether a State statute barring the payment of unemployment benefits to strikers was preempted by certain federal statutes.[3] The Court specifically examined the provisions quoted above and concluded:

[W]hen Congress wished to impose or forbid a condition for compensation, it was able to do so in explicit terms. There are numerous examples, in addition to [26 U.S.C. § 3304(a)(5)], less related to labor disputes but showing a congressional ability to deal with specific aspects of state plans. The fact that Congress has chosen not to legislate on the subject of labor dispute disqualifications confirms our belief that neither the Social Security Act nor the Federal Unemployment Tax Act intended to restrict the States' freedom to legislate in this area.

*Id.* at 488–489, 97 S.Ct. at 1908 (footnotes omitted).

The failure of Congress to forbid the payment of benefits to strikers takes on additional significance in light of the fact that it had been urged to do so. Hearings on S. 1130 before the Senate Comm. on Finance, 74th Cong., 1st Sess. 228 (1935) (Edmund Witte, Executive Director, President's Committee on Economic Security, recommendation on behalf of Advisory Council); *id.* at 472 (Dr. Abraham Epstein, American Association for Society Security, proposed draft of bill); *id.* at 959 (statement of Noel Sargent, National Association of Manufacturers). The Senate Committee Report stated:

Except for a few standards which are necessary to render certain that the State unemployment compensation laws are genuine unemployment compensation acts and not merely relief measures, the States are left free to set up any unemployment compensation system they wish, without dictation from Washington.

S.Rep.No. 628, 74th Cong., 1st Sess. 13 (1935), *reprinted in* 1 Social Security: Documentary History of the Social Security Act of 1935 (1942); *see* H.R.Rep.No. 615, 74th

---

**3.** The Supreme Court expressly declined to consider the preemptive effect of the NLRA on

the statute at issue. 431 U.S. at 475 n. 3, 97 S.Ct. 1898.

Cong., 1st Sess. 8–9 (1935), *reprinted in* 1 Social Security: Documentary History of the Social Security Act of 1935 (1942). *See also, Hodory, supra*, 431 U.S. at 482–487, 97 S.Ct. 1898.[4] This expression of congressional intent to avoid excessive intrusion into local affairs is entirely consistent with the doubt that existed at that time concerning Congress' power to enact legislation of this character without encroaching to an unconstitutional degree on the powers of the States. In *Steward Machine Co. v. Davis, supra*, for example, Justices McReynolds, Sutherland, Van Devanter and Butler dissented on Tenth Amendment grounds from the judgment upholding the Social Security Act. *Cf. National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). The New York statute, the Social Security Act and the NLRA were each born of an era which had not forgotten that "[i]t is one of the happy incidents

of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

Moreover, it is particularly noteworthy that Congress was aware of the New York statute when it enacted the NLRA and the Social Security Act. The New York statute had taken effect on April 25, 1935, two months before the NLRA and almost four months before the Social Security Act.[5] Indeed, the Senate Report to the Social Security Act cited New York as one of the five States with a statute of the sort that Congress sought to encourage other States to enact. S.Rep.No. 628, *supra*, at 11. Within the next few years, the Social Security Board approved New York's statute, along

---

4. An analysis of the Social Security Bill published in the New York Times on August 10, 1935, reported that, "[t]he bill allows the States the widest discretion in setting up their own requirements," and, again, that, "[t]he States have the widest possible latitude to set up their own unemployment compensation systems . . .." N.Y. Times, Aug. 10, 1935, at 4, col. 2, *reprinted in* 79 Cong.Rec. 13079 (1935).

5. The public policy underlying New York's statute is stated in § 501 of the Labor Law:
Public policy of state
   As a guide to the interpretation and application of this article, the public policy of this state is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, welfare, and morale of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden, which now so often falls with crushing force upon the unemployed worker and his family. After searching examination of the effects of wide spread unemployment within the state, the joint legislative committee on unemployment appointed pursuant to a joint resolution adopted April ninth, nineteen hundred and thirty-one, reported to the legislature that "the problem of unemployment can better be met by the so-called compulsory unemployment insurance plan than it is now handled by the barren actualities of poor relief assistance backed by compulsory contribution through taxation. Once the facts are apprehended this conclusion is precipitated

with the certainty of a chemical reaction." Taking into account the report of its own committee, together with facts tending to support it which are matters of common knowledge, the legislature therefore declares that in its considered judgment the public good and the well-being of the wage earners of this state require the enactment of this measure for the compulsory setting aside of financial reserves for the benefit of persons unemployed through no fault of their own. N.Y.Lab.Law § 501 (McKinney 1977).
   New York's provision of benefits to strikers after eight weeks represents a good faith attempt to strike a balance between neutrality in the collective bargaining process—which the State maintains for the first eight weeks—and the social and economic well-being of its citizens—an interest which lies well within its legislative powers. *W. H. H. Chamberlin, Inc. v. Andrews*, 159 Misc. 124, 286 N.Y.S. 242 (Sup.Ct. Onondaga County), *modified*, 271 N.Y. 1, 2 N.E.2d 22, *aff'd without opinion by an equally divided Court*, 299 U.S. 515, 57 S.Ct. 122, 81 L.Ed. 380 (1936).
   Harold Kasper, the Director of the Unemployment Insurance Division of the New York Department of Labor, testified at trial that the three most important objectives of the statute were (1) to "cushion the economy" by keeping in circulation money which the strikers would ordinarily spend on food, housing and the like; (2) to aid the striker to pay essential expenses; and (3) to maintain a labor force for the struck employer until the strike is over.

with three others which authorized the payment of benefits to strikers. The Secretary of Labor, whose responsibility it now is to certify State laws on an annual basis, has consistently approved New York's law. The significance of this fact is limited, because they were required to approve all laws that met the minimum requirements of 26 U.S.C. § 3304(a). *Hawaiian Telephone Co., supra*, 405 F.Supp. at 285. Nevertheless, the Secretary's continuing review is relevant. Government administrators serve as conduits through which the executive and, eventually, the legislative branches obtain information concerning the operation of the laws for which the administrators are responsible. The greater the oversight, the more likely it is that Congress will be aware of State statutes which are or have become "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (footnote omitted).

The next opportunity Congress had to consider whether unemployment compensation should be paid to strikers was in 1947 when the House of Representatives considered and passed the Hartley Bill, which excluded striking employees who accepted unemployment compensation from the definition of "employee" under § 2(3) of the NLRA and thereby effectively denied them the protections of the Act. H.R. 3020, 80th Cong., 1st Sess. (1947), *reprinted in* 1 NLRB, *Legislative History of the Labor Management Relations Act, 1947* 158 (1948). The House Report stated that this was appropriate because the payment of such benefits was a "perversion" of the purposes of social security legislation. H.R.Rep.No. 245, 80th Cong., 1st Sess. 12 (1947), *reprinted in* 1 NLRB, *Legislative History of the Laor Management Relations Act, 1947* 303 (1948). The Minority Report argued that "[u]nder the Social Security Act . . . the determination of these matters was advisedly left to the States." *Id.* at 68 (Minority Report), *reprinted in* 1 NLRB, *Legislative History of the Labor Management Relations Act, 1947* 359 (1948). The Senate

Bill did not contain the exclusion, and the Senate version was accepted by the Conference Committee with little further discussion. Conf.Rep.No. 510, 80th Cong., 1st Sess. 32–35, *reprinted in* [1947] U.S. Code Cong.Serv. pp. 1135, 1137–41; 1 NLRB, *Legislative History of the Labor Management Relations Act, 1947* 536–39 (1948); *see* Labor Management Relations (Taft-Hartley) Act of 1947, Pub.L.No. 80–101, § 101, 61 Stat. 136 (1947).

In 1969 Congress again considered these matters. President Nixon sought legislation amending the Federal Unemployment Tax Act to include a "requirement that [the] practice of paying unemployment insurance benefits to workers directly engaged in a strike be discontinued." Message from the President, 115 Cong.Rec. 18538 (1969). The proposal was not adopted. Employment Security Amendments of 1970, Pub.L.No. 91–373, 84 Stat. 695 (1970). The reason for its rejection, as explained by Committee Chairman Mills on the floor of the House, was that:

> We have tried to keep from prohibiting the States from doing the things the States believe are in the best interest of their people. There are a lot of decisions in this whole program which are left to the States.

> For example, there are two States [New York and Rhode Island] which will pay unemployment benefits when employees are on strike, but only two out of 50 make that decision. That is their privilege to do so. They are taxing their employers within the State to pay unemployment benefits. If the legislature wants to do it, why not let them do it? I would not vote for it . . . but if the State wants to do it we believe they ought to be given latitude to enable them to write the program they want.

115 Cong.Rec. 34106 (1969).

Considering the fact that the matter has long been a political "hot potato," it is not at all surprising that Congress would wish to leave it in the hands of local officials. However, congressional intent need not be inferred from the possibility of political ti-

midity; the national interest can be served as well by individual State experimentation as by enforced national uniformity. *See New State Ice Co. v. Liebmann, supra,* 285 U.S. at 311, 52 S.Ct. 371 (Brandeis, J., dissenting).

As the Supreme Court noted in *Hodory, supra,* Congress has shown an ability to deal with specific aspects of State plans. 431 U.S. at 488, 97 S.Ct. 1898. In 1976, for example, Congress amended the Unemployment Tax Act to prohibit the payment of unemployment compensation to athletes during the off season, Act of Oct. 20, 1976, Pub.L.No. 94–566, § 314(a)(13), 90 Stat. 2667, 2680, 26 U.S.C. § 3304(a)(13), and to illegal aliens, *id.,* § 314(a)(14), 90 Stat. at 2680, 26 U.S.C. § 3304(a)(14). On the other hand, Congress prohibited the States from denying benefits on the basis of pregnancy. *Id.,* § 312(a)(12), 90 Stat. at 2679, 26 U.S.C. § 3304(a)(12).

In other contexts, Congress has itself afforded benefits to striking workers. The Railroad Unemployment Insurance Act, Pub.L.No. 75–722, 52 Stat. 1094 (1938), *as amended,* 45 U.S.C. § 351 *et seq.,* provides for the payment of benefits to those who participate in lawful strikes. *Id.,* § 4(c), 52 Stat. at 1099, *as amended,* 45 U.S.C. § 354(a–2)(iii). The Food Stamp Act of 1964, Pub.L.No. 88–525, 78 Stat. 703, *as amended,* 7 U.S.C. § 2011 *et seq.,* was changed in 1971 to establish a set of uniform national standards of eligibility for food stamps, and expressly provides that strikers are not disqualified. Act of Jan. 11, 1971, Pub.L.No. 91–671, § 4, 84 Stat. 2048, 2050, 7 U.S.C. § 2014(c). Finally, Congress has left the States free to determine whether benefits under the Aid to Families with Dependent Children program, 42 U.S.C. § 601 *et seq.,* may be denied to the children of strikers. *See Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977).

We are aware of only one exception to the rule that Congress has either provided for benefits to strikers or left the matter to the States. In the unemployment laws of the District of Columbia, benefits are denied to strikers. However, this fact is of limited significance. "Because the District has no Congressional vote, Congress legislates for the District in a relative political vacuum . . . ." *Hawaiian Telephone Co., supra,* 405 F.Supp. at 285.

Our review of the relevant legislative history discloses no clear preemptive intent; indeed, virtually all the evidence is to the contrary. As mentioned above, the question whether striking employees should be afforded unemployment compensation has been a significant political issue since the early 1930s. In 1935, at a time when Congress sought to encourage the States to enact unemployment compensation statutes, New York was in the forefront, and its law granted compensation to strikers. For over forty years, Congress has been aware of the issue in general, and of New York's program in particular. "Congressional awareness, the availability of opportunities to act, and Congressional action in closely related matters," *Grinnell, supra,* 475 F.2d at 454, are all relevant in trying to determine Congress' intent, and all are present here. Moreover, their probative value increases over time. A long-standing practice "is not something to be lightly cast aside." *Walz v. Tax Commission,* 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). Accordingly, we hold that, notwithstanding the general rule that State statutes which touch or concern labor relations should be neutral, *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission, supra,* 427 U.S. at 149–50, 96 S.Ct. 2548, and despite the otherwise broad preemptive scope of the federal labor laws, Congress has not expressed an intent to preempt State unemployment compensation laws that provide benefits to strikers. Quite to the contrary, it has evinced an intention to leave the States free to regulate in this area. Therefore, the conflict between New York's statute and the broad federal policy of free collective bargaining does not render the State statute unconstitutional. The conflict is one which Congress has decided to tolerate.

Several additional matters remain to be considered. In their fifth and sixth causes of action, the plaintiffs allege violations of the due process and equal protection clauses of the Fourteenth Amendment. In a memorandum denying the defendants' motion for summary judgment, Judge Owen expressed "substantial doubt that § 592.1 is so irrational as to be violative of" either of those clauses.[6] He reserved decision on the defendants' motion insofar as it related to these causes of action, pending the development of a full trial record. In a post-trial memorandum, plaintiffs argued that New York's statute impermissibly treated employers of striking employees in the same manner as employers of employees who were involuntarily unemployed. Plaintiffs relied primarily upon the decision of a three-judge district court in *Hodory v. Ohio Bureau of Employment Services*, 408 F.Supp. 1016 (N.D. Ohio 1976). Judge Owen, in his decision of May 23, 1977, did not reach the Fourteenth Amendment issue; his conclusion regarding the preemption issue made it unnecessary to do so. Under such circumstances, our reversal on the preemption issue would ordinarily require us to remand for further consideration of the Fourteenth Amendment issue. However, on May 31, 1977, the Supreme Court reversed the district court decision in *Hodory* and upheld, against an equal protection challenge, a State statute that did not pay benefits to strikers. The Court explained that "[t]he decision of the weight to be given the various effects of the statute [on employers and employees], however, is a legislative decision, and appellee's position is contrary to the principle that 'the Fourteenth Amendment gives the federal courts no power to impose upon the States their views of what constitutes wise economic or social policy.'" 431 U.S. at 490, 97 S.Ct. 1898, *quoting Dandridge v. Williams*, 397 U.S. 471, 486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). In view of *Hodory*, a remand for further consideration of the issue would be a futile gesture. Finally, we are as puzzled by the plaintiffs' allegation of a due process violation as the Supreme Court was of a similar allegation in *Hodory*. 431 U.S. at 493, 97 S.Ct. 1898. Plaintiffs have never alleged a violation of their right to procedural due process, and the question whether New York's statute violates an employer's substantive due process rights has been resolved by the Supreme Court. *W. H. H. Chamberlin, Inc. v. Andrews*, 159 Misc. 124, 286 N.Y.S. 242 (Sup.Ct. Onondaga County), *modified*, 271 N.Y. 1, 2 N.E.2d 22, *aff'd without opinion by an equally divided Court*, 299 U.S. 515, 57 S.Ct. 122, 81 L.Ed. 380 (1936).

Accordingly, the judgment of the district court is reversed, and the case is remanded with instructions to dismiss the complaint.