IMAGE CARRIER CORPORATION,
Appellee,

v.

Abraham D. BEAME, Mayor of New York City, et al., Appellants.

The HOUSE OF LITHOGRAPHY, INC., et al., Appellees,

v.

Abraham D. BEAME, Mayor of New York City, et al., Appellants.

Nos. 79, 80 and 82, Dockets 77–7205, 77–7206 and 77–7224.

United States Court of Appeals, Second Circuit.

Argued Sept. 20, 1977.

Decided Dec. 30, 1977.

Carolyn E. Demarest, Asst. Corp. Counsel, New York City, W. Bernard Richland, Corp. Counsel, New York City, for appellant New York.

Francis T. Coleman, Washington, D. C. (Donald L. Rosenthal, Washington, D. C., Townley & Updike, New York City, of counsel), for appellee.

Norman Rothfeld, New York City, (Menagh, Trainor & Rothfeld), for intervenor-appellant.

Before SMITH, ANDERSON and OAKES, Circuit Judges.

OAKES, Circuit Judge:

This appeal raises the specter of *Lochner v. New York,* 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905), which, with the possible exception of *Scott v. Sandford,* 60 U.S. (19 How.) 393, 15 L.Ed. 691 (1857) (the *Dred Scott* case), remains the most discredited of Supreme Court decisions. We reject the attempt to resurrect this apparition of the past.

At issue below,[1] as well as on this appeal, is a policy of the City of New York (City) whereby only printers employing union labor and exhibiting the union label are permitted to bid for the City's "flat-form printing" business.[2] Utilizing traditional equal protection analysis, thereby avoiding the substantive due process issue raised by

appellees, the United States District Court for the Southern District of New York, Lloyd F. MacMahon, *Judge,* found the City's practice "irrational" and hence unconstitutional.[3] We reverse the district judge's equal protection holding and find no violation of appellees' due process rights. However, we agree with the district judge that this case is not appropriate for abstention, that appellees have standing to raise their constitutional claims and that Section 7 of the National Labor Relations Act (NLRA)[4] does not preempt the City's practice of favoring union printers.

I

FACTS

Appellees, plaintiffs in the district court, are non-union printers. Appellants, defendants below, are City officials who enforce the practice of restrictive bidding on flatform printing contracts. The Allied Printing Trades Council of Greater New York, an umbrella organization of printing unions, has participated in these proceedings as intervenor.

The controversy arises over a Resolution (Resolution) adopted April 12, 1934, by the New York Board of City Record[5] requiring bidders for flat-form work to operate a

---

1. The federal claims were presented pursuant to 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343(3). Declaratory relief was sought under 28 U.S.C. § 2201, as was injunctive relief.

2. "Flatbed printing," another term for flat-form printing, utilizes "a printing press in which a flat bed holding the printing form moves against a revolving cylinder which carries the paper." The Random House Dictionary of the English Language (1966).

3. The opinion below is reported at 430 F.Supp. 579 (S.D.N.Y.1977).

4. Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, provides:
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the

purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement *requiring* membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

5. The Resolution, signed by Mayor LaGuardia and the then City Comptroller and Corporation Counsel, provides in pertinent part:
1. That all printed forms hereafter purchased for the use of the City of New York by the Board of City Record shall bear the label of the Allied Printing Trades Council of the City of New York. This rule shall not apply to letterheads and envelopes.
2. That all bidders be required to certify they operate a union plant and pay the prevailing rate of wages in all divisions of their establishment.

union plant and to pay the "prevailing rate of wages."[6] In addition, the forms printed for the City must bear the union label. These requirements are followed by the Department of Purchase,[7] the Board of Education[8] and the Health and Hospitals Corporation.[9] We need not question the district court's factual findings that printing quality is not a function of union status[10] and that the 350 nonunion shops in New York, as compared to the 250 union shops, come closer to paying the required prevailing wage rate,[11] because we believe that a rational basis for the City's policy exists.

---

**6.** This rate is determined in accordance with state law. N.Y. Labor Law § 220(5)(a) (McKinney Supp. 1976) states:

The "prevailing rate of wage," for the intents and purposes of this article, shall be the rate of wage paid in the locality as hereinafter defined to the majority of workmen, laborers or mechanics in the same trade or occupation at the time the work is performed. In the event that it be determined that there is not a majority in the same trade or occupation paid at the same rate, then the rate paid to the greater number in such trade or occupation shall be the prevailing rate, provided such greater number constitutes at least forty per centum of the laborers, workmen or mechanics engaged in such trade or occupation; in the event there is less than forty per centum of the laborers, workmen or mechanics engaged in the same trade or occupation ·in the same locality paid the same rate, then the average paid to such laborers, workmen or mechanics in the same trade or occupation shall be the prevailing rate. Laborers, workmen or mechanics for whom a prevailing rate of wage is to be determined shall not be considered in determining such prevailing wage.

**7.** The Department's Supplement to Standard Instructions to Bidders states:

Unless otherwise specified in the schedule, all work must be done in a union printing plant located within the City of New York. The union label must appear on all printing except letterheads, noteheads and any other printing excepted in the schedule.

**8.** The Board's Bid Invitation for Jobs of $5,000 or Less includes the language:

Unless otherwise specified, all printing required by this contract except envelopes, must be done in a printing plant located within the City of New York. The union label must appear on all of the forms, required under this contract, except letterheads, noteheads and envelopes.

**9.** A December 3, 1971, memorandum of the Health and Hospitals Corporation provides:

[T]he Health and Hospitals Corporation will follow the procedure established by the New York City Department of Purchase in which letterpress or offset printing and all accessory operations as required will be done in a union printing plant located within the City of New York. The union label must appear

on all printing except letterheads and noteheads.

This policy applies to the hospitals as well as Central Office procurement.

**10.** 430 F.Supp. at 584.

**11.** The district judge found:

Even assuming that the purpose was to ensure that the prevailing wage rate is paid, the evidence here refutes defendants' contention that the challenged classification rationally furthers that purpose. We will assume, *arguendo,* that Section 220 of the New York State Labor Law sets the prevailing wage rate, as defendants contend. That statute defines "the prevailing rate of wages" as that rate paid to the majority of workmen, laborers or mechanics in the same trade. It does not mention labor unions.

The only testimony before us concerning the employment status of the "majority of workmen, laborers or mechanics" in the printing trade is that there are 350 non-union, as compared to 250 union, shops in a trade association known as Printing Industries of Metropolitan New York. This evidence indicates that the prevailing wage rate, as defined by the statute on which defendants rely, follows the non-union rate more closely than the union rate and, therefore, undermines defendants' contention that the union label requirement safeguards payment of the prevailing wage rate.

Moreover, plaintiffs' expert testified that there is no correlation between the union or non-union status of a printing company and the wage rates it pays to its employees; some non-union rates are as high or higher than some union rates. He further testified that union rates vary considerably.

Union rates, therefore, do not necessarily meet the prevailing wage rate. More fundamentally, there is no evidence here of any natural, logical or necessary correlation between the union wage rate and the prevailing wage rate. Nor is there any evidence showing any reason why non-union rates might not approximate the prevailing wage rate as closely as union rates. The presumption of validity must yield to the evidence which showed that there was no logical or even statistical correlation between the prevailing wage rate and the union or non-union status of the printing company.

*Id.* at 584–85 (footnotes omitted).

## II

## DISCUSSION

### A. *Abstention*

#### 1. *"Pullman" Abstention.*

■ Judge MacMahon was correct in not exercising his discretionary authority under *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 500–01, 61 S.Ct. 643, 85 L.Ed. 971 (1941), to abstain when state law is uncertain and a state court construction might obviate the need for federal constitutional adjudication. This case, as in *McRedmond v. Wilson,* 533 F.2d 757, 759 (2d Cir. 1976), "does not present the narrowly limited circumstances permitting invocation of the doctrine . . . ." A decision on the constitutional claims does not depend on an interpretation of unclear or complex state law. *See id.* at 760, 762. There is no ostensible basis for interpreting the Resolution, or the bidding requirements implementing it, to permit nonunion shops to do flat-form printing for the City. Even if nonunion shops pay the prevailing wage rate, *see* note 6 *supra,* they are nevertheless precluded from bidding because the Resolution is drafted in the conjunctive: the printer must be "a union plant *and* pay the prevailing rate of wages." (Emphasis added.) The union-status requirement is clear and without ambiguity. *Cf. Lake Carriers' Association v. MacMullan,* 406 U.S. 498, 511, 92 S.Ct. 1749, 1758, 32 L.Ed.2d 257 (1972) (abstention appropriate where statute is unclear "in particulars that go to the foundation of . . . grievance").

#### 2. *"Younger" abstention.*

Allied's request for federal court abstention based on *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and subsequent cases amplifying *Younger, e. g., Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211,

51 L.Ed.2d 376 (1977); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975), is totally misplaced. There is no ongoing, *see, e. g., Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977), or even contemplated, *see Doran v. Salem Inn, Inc.,* 422 U.S. 922, 929, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975), state proceeding with which the federal action interferes. While appellees claim that the Resolution is invalid under state law,[12] this is a wholly inadequate basis for invoking federal court abstention.

### B. *Justiciability*

#### 1. Standing.

■ As prospective bidders for City business, appellees clearly have economic interests at stake sufficient to give them standing.[13] Their injury in fact is loss of business which, even though indirect, is "fairly traceable to the defendant's acts or omissions." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977). Since the trial court found that some nonunion shops were perfectly capable of doing the City's work, 430 F.Supp. at 584, 585, appellees' injury is a type "likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976).

#### 2. Ripeness.

■ We read Allied's standing argument as implicitly questioning the ripeness of appellees' claims. Essentially, Allied suggests that appellees should have bid for City work and been turned down in order to present a justiciable claim. However, it would have been futile to do so since it is

---

**12.** Neither our decision nor that of the district court addresses these claims.

**13.** Appellees have standing even under the most restrictive of recent Supreme Court standing cases, *see, e. g., Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v.*

*Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and of recent standing cases in this court, *see, e. g., City of Hartford v. Town of Glastonbury,* 561 F.2d 1032 (2d Cir. 1977) (en banc), *petition for cert. filed,* —— U.S. ——, 98 S.Ct. 766, 54 L.Ed.2d 781 (1977) (No. 77–639).

obvious that they could not have been awarded a contract.

In *United States Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), the Court *sub silentio* found a ripe controversy in circumstances virtually identical to those present in *United Public Workers v. Mitchell*, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754 (1947). The reason for the different outcomes on the ripeness issue in *Letter Carriers* and in *Mitchell* must have been the passage of time and the ensuing accumulation of experience, interpretation and administration of the Hatch Act. *See* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart and Wechsler's The Federal Courts and the Federal System* 32 (2d ed. Supp.1977). The record indicates that a number of policy memoranda and contract forms have been developed to implement the union label rule, *see* notes 7–9 *supra,* which was first promulgated in 1934. After 43 years of following its pro-union policy the City's position is amply developed. Requiring a nonunion shop to undergo the expense of preparing a bid with the certainty that it will be rejected imposes unnecessary financial hardship, *see Abbott Laboratories v. Gardner*, 387 U.S. 136, 153, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), without framing the issues more sharply.

## C. *Preemption.*

■ We do not believe that Section 7 of the NLRA, note 4 *supra,* preempts and thereby invalidates the City's Resolution under the Supremacy Clause of the Constitution. Section 7 gives employees the right not to join a union under certain circumstances. Neither the City's Resolution nor its policy memoranda and bidding instructions implementing the Resolution requires any employee to join a union. Rather, the City's policy merely prefers union *shops* to nonunion *shops* in awarding flat-form printing contracts. Moreover, nothing in the sparsely developed record indicates that the City's flat-form printing needs, as distinguished from either the City's overall printing needs or the total printing work available in and around New York City, are substantial enough to have even an indirect coercive effect on nonunion employees to abandon their Section 7 right not to join a union. Indeed, the only relevant statistic in the entire record belies such an effect: the obvious logical inference to be drawn from the presence of 350 nonunion shops and 250 union shops in the printing business in New York City is that printing employees have not in substantial number relinquished their Section 7 rights.[14] Because appellees have nowhere indicated how the City's practice in any way alters the collective bargaining relationship within nonunion shops, there is no need to determine whether Congress intended that federal labor law preempt those local practices which do alter collective bargaining relationships. *Cf. New York Telephone Co. v. New York State Department of Labor,* 566 F.2d 388 at 395 (2d Cir. 1977) (even where state unemployment compensation benefits paid to striking employees may affect union's ability to maintain a strike, Congress intended to allow states to legislate in this area).

## D. *The Merits*

■ Just as the Due Process clause of the Fourteenth Amendment did not "enact Mr. Herbert Spencer's Social Statics,"[15] the Equal Protection Clause of the same amendment[16] did not enact Professor Milton Friedman's economics of the market-

---

14. The record does not indicate whether the total number of nonunion employees is greater than the total number of union employees.

15. *Lochner v. New York,* 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905) (Holmes, J., dissenting).

16. Justice Holmes's famous statement in *Lochner* referred to the Fourteenth Amendment as a whole although the decision rested on the Due Process clause. The Equal Protection clause, until Mr. Justice Jackson's prescient concurrence in *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 111, 69 S.Ct. 463, 93 L.Ed. 533 (1949), had been relegated to the status of the "last resort of constitutional arguments." *Buck v. Bell,* 274 U.S. 200, 208, 47 S.Ct. 584, 71 L.Ed. 1000 (1927) (Holmes, J.).

place.[17] Since the days of the Depression the declared policy of the nation has been to foster collective bargaining, NLRA § 1, 29 U.S.C. § 151. Similarly, the avowed policy of the State of New York, embodied in its State Labor Relations Act, is to promote collective bargaining:

> It is in the public interest that equality of bargaining power be established and maintained. It is likewise recognized that the denial by some employers of the right of employees freely to organize and the resultant refusal to accept the procedure of collective bargaining, substantially and adversely affect the interest of employees, other employers, and the public in general. . . .
>
> .    .    .    .    .
>
> Experience has proved that protection by law of the right of employees to organize and bargain collectively, removes certain recognized sources of industrial strife and unrest, encourages practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours or other working conditions, and tends to restore equality of bargaining power between and among employers and employees, thereby advancing the interests of employers as well as employees.[18]

In the depths of the Depression in 1934, when the Resolution was promulgated (although before the State Labor Relations Act was itself adopted), it was entirely rational for the City fathers to believe that it was "in the public interest that equality of bargaining power be established and maintained" and that their pro-union Resolution would restore "equality of bargaining power" to printing employees, remove "certain recognized sources of individual strife and

unrest," raise "the purchasing power of wage earners," reduce unemployment, and lessen the effects of "recurrent business depressions." N.Y. Labor Law § 700 (McKinney 1977). At least, that is what we read into the preamble to the Resolution insofar as it refers to lending "the greatest measure of and assistance during the present economic depression" to those citizens engaged in the printing industry.[19] To be sure, times have changed. Perhaps, as a matter of policy, favoring unionized employers should be reexamined by the responsible authorities, now that both the quality of printing and the wages paid may be roughly equivalent. *See* 430 F.Supp. at 584–85. But reevaluating the wisdom of the Resolution is a legislative decision. And in economic matters, whether under the guise of substantive due process, *Ferguson v. Skrupa,* 372 U.S. 726, 729–32, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical, Inc.,* 348 U.S. 483, 487–88, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *see* Comment, 50 N.Y.U.L.Rev. 1149, 1152 & n.16 (1975), or of equal protection, *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Dandridge v. Williams,* 397 U.S. 471, 486–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *Williamson v. Lee Optical, Inc., supra,* 348 U.S. at 488–89, 75 S.Ct. 461, the courts have not, since the days of the Depression, interfered with legislative judgments rationally related to a legitimate governmental objective.

Judgment reversed.

ROBERT P. ANDERSON, Circuit Judge, concurring in part, dissenting in part:

I concur in those portions of the majority opinion which uphold the district court's

---

**17.** *E. g.,* M. Friedman, *There's No Such Thing as a Free Lunch* (1975).

**18.** N.Y. Labor Law § 700 (McKinney 1977).

**19.** Intervenor's answer, ¶ 13, refers in addition to "special values" from union labels and "assurances of craftsmanship," to the Resolution's promoting "assurance of satisfactory working conditions collectively bargained on behalf of the employees, assurance of freedom from labor disputes for the durations of said collective

bargaining agreements, effectuation of the public policy of the State of New York and other benefits to the defendants . . . .." We believe the court can and should take judicial notice of the policies underlying the federal and state labor relations acts, that the Intervenor advanced these policies as justification for the Resolution by its answer below, and that a city might *rationally* think those policies promoted by the specifications here in issue.

conclusions concerning abstention, standing, ripeness and federal preemption, but I dissent from the holding on the merits and the reversal of the judgment of the district court.

At the trial below, appellants asserted that the City's restrictive bidding policy served several purposes: (1) to effectuate New York law requiring the payment of the prevailing wage rate to workers under public contract, Labor Law § 220(3); (2) to further the City's interest in obtaining work of good quality; and (3) to facilitate the policing of printers' claims for overtime wages. After carefully considering the evidence presented in support of these claims, the district court correctly rejected them.

At no time before or during the trial did appellants argue that the City's policy was designed to further the federal and state interest in fostering collective bargaining. See National Labor Relations Act § 1, 29 U.S.C. § 151; New York Labor Law § 700. The appellants raised this contention for the first time on appeal, and it is wholly unsupported by any evidence in the record or any offer of proof. See *Sugarman v. Dougall,* 413 U.S. 634, 645, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973). It was presented at oral argument as the principal justification for the policy. The majority accepts this rationale, and, relying on the language of Labor Law § 700, concludes that the City's pro-union Resolution reflects a considered legislative judgment that such a policy will help to restore equality of bargaining power to printing employees and to lessen the effects of recurrent business depressions. In the absence of supporting proof for these conclusions, the majority's adoption of appellants' eleventh hour justification for the restrictive policy is unwarranted. Although legislative economic classifications are presumed to be constitutional, it is not evident that the pro-union Resolution in question here is rationally related to the state's legitimate interest in fostering collective bargaining. There has been no showing that the City's bidding regulation was intended to or does, in fact, promote this purpose. The preamble to the Executive Order of April 12, 1934, simply states:

"Resolved that in order to lend the greatest measure of aid and assistance *during the present economic depression* to those citizens of our city engaged in the various branches of the printing industry, the following provisions be made a part of each and every contract and open market order issued by the Board of City Record." (Emphasis added.) As stated in an affidavit submitted by appellants, the policy was enacted to alleviate the high rate of unemployment that confronted union employees in the printing industry in New York City in 1934. No more expansive legislative history accompanied the Resolution; no further explanations of its purposes were offered when subsequent administrations made *executive* decisions to continue this restrictive practice; and no mention of a desire to promote collective bargaining was ever made in connection with this "union shop only" policy.

Appellants concede that the Resolution is no longer justified by a need to keep printing businesses in New York City or to provide jobs for union workers. See *Abie State Bank v. Bryan,* 282 U.S. 765, 51 S.Ct. 252, 75 L.Ed. 690 (1931). Instead, they argue that it has other beneficial effects for the City. They attempted to demonstrate its importance at the trial, but failed even to discuss its relationship to the goal of collective bargaining or the purposes of New York Labor Law § 700.

The majority cannot rely upon this state statute, however, because it was not added to the New York Labor Relations Act until 1940—six years after the promulgation of the pro-union Resolution—and, therefore, an effort to further its purposes cannot be imputed to the signers of the Executive Order. Moreover, it is significant that while § 700 is designed to promote collective bargaining, it makes no effort to preclude non-union shops from bidding on public works contracts. General Municipal Law § 103 makes it clear that, except as otherwise expressly provided by a local law adopted prior to September 1, 1953, contracts for public work, including printing contracts, are to be awarded to the *lowest*

*responsible bidder.* The "lowest responsible bidder" has been held to include non-union as well as union shops, see *Apex Indust. Const. Corp. v. Village of Lake George,* 31 A.D.2d 670, 295 N.Y.S.2d 548 (1968); *Long Island Signal Corp. v. County of Nassau,* 51 Misc.2d 320, 273 N.Y.S.2d 188 (1966); and, therefore, agencies of New York *State* could not lawfully refuse to award a contract to a successful bidder solely because it employed non-union workers.

When local economic regulations are challenged as violating the Equal Protection Clause, the court will defer to legislative determinations as to the desirability of particular statutory discriminations, provided that the classification challenged is rationally related to a legitimate state interest. *New Orleans v. Dukes,* 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). In this case, appellants have failed, however, to show that the City's ban on the use of non-union labor in performing certain public printing contracts has any bearing upon the state's interest in collective bargaining or the payment of the prevailing wage rate or to the City's interest in the ability of the printing shops reliably to perform high quality work.[1] Cf. *Sugarman v. Dougall, supra.*

The City is a corporate body and, as such, it may enter into contracts and hold and dispose of property. When it does so, however, it acts as trustee for the people of the City, and it is in this trust capacity that, in the City's name, it enters into contracts and expends the people's money through a city government of the people's own creation. The City, therefore, has an obligation to conserve public funds. To this end, regulations were enacted to govern bidding on public contracts to ensure that such contracts are awarded to the lowest responsible bidder. These regulations are designed to benefit the public, not the bidders. See *General Bldg. Contractors v. Bd. of Trustees,* 42 A.D.2d 660, 345 N.Y.S.2d 195 (1973); *Allen v. Eberling,* 24 A.D.2d 594, 262 N.Y. S.2d 121 (1965); *Marino v. Town of Ramapo,* 68 Misc.2d 44, 326 N.Y.S.2d 162 (1971). They should not be used to promote the interests of labor organizations by forcing printing shops to unionize in order to qualify for city contracts. Both union and non-union shops have a right to apply for public printing contracts on equal terms. The conditions which must be met to receive the award of such a contract must be reasonable and related to qualifications for the job to be performed. In this case, appellants' restrictive, "union shop only" policy fails to meet this test.[2]

1. Appellants would have this court take judicial notice that union printing shops would be more reliable in meeting contract deadlines than non-union shops because labor disruptions would be minimized. They have introduced no evidence to support this claim and the court should not take it upon itself to attribute irresponsibility in labor matters to the owners of non-union shops where there has been no proof of such conduct.

2. If, instead of having before it the present case, this court were to be presented with an attack by organized labor on the obverse of the city's present policy, *i. e.,* a policy restricting bidding on city printing contracts to *non*-union shops only, there is little doubt that the court would hold that such a resolution was inconsistent with state law designed to protect the right of employees to freedom of association and organization, and that it was, therefore, invalid. New York Labor Law § 712; see also, Municipal Home Rule Law § 10; *Wholesale Laundry Bd. of Trade, Inc. v. City of New York,* 17 A.D.2d 327, 234 N.Y.S.2d 862, *aff'd,* 12

N.Y.2d 998, 239 N.Y.S.2d 128, 189 N.E.2d 623 (1962); *City of Corning v. Corning Police Dept.,* 81 Misc.2d 294, 366 N.Y.S.2d 241, *aff'd without opinion,* App.Div., 373 N.Y.S.2d 1022 (1975). State statutes which touch or concern labor relations, however, should be neutral, *Lodge 76, International Assn. of Machinists v. Wisconsin Emp. Rel. Commission,* 427 U.S. 132, 149–150, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976); *New York Tel. Co. v. New York State Dept. of Labor,* 566 F.2d 388 at 395 (2d Cir. 1977); and although the New York State Labor Relations Act encourages collective bargaining, it does not mandate it; nor does it require that all labor performed for the state or its subdivisions must be consummated by organized labor and by no one else. By exerting economic pressure on unorganized employees to unionize, the city's pro-union Resolution interferes, just as significantly as would a "non-union only" policy, with associational freedoms protected by state law; and, therefore, should not be declared lawful. The impartial and evenhanded administration of justice as well as the

Accordingly, I would affirm the judgment of the district court.

interests of the public call for a balanced and fair approach which makes neither the union employees nor the non-union employees an ineligible class of bidders.